[No. 90608-4.

Argued May 7, 2015.     Decided December 31, 2015.

THE CITY OF SEATTLE, *Respondent*, v. WAYNE ANTHONY EVANS, *Petitioner*.

*Casey Grannis* (of *Nielsen Broman & Koch PLLC*), for petitioner.

*Peter S. Holmes, City Attorney*, and *Richard E. Greene, Assistant*, for respondent.

*Neil M. Fox* and *Lila J. Silverstein* of Washington Association of Criminal Defense Lawyers, amicus curiae.

¶1 WIGGINS, J. — Wayne Anthony Evans contends that Seattle Municipal Code (SMC) 12A.14.080[1] violates his right to bear arms under article I, section 24 of the Washington Constitution and the Second Amendment to the United States Constitution because the ordinance does not permit him to carry a small, fixed-blade "paring" knife for the purpose of self-defense. A jury convicted Evans of violating this ordinance, and both the superior court and the Court of Appeals affirmed.

¶2 We affirm the Court of Appeals but on different grounds. We hold that Evans's paring knife is not an arm entitled to constitutional protection and that Evans therefore cannot establish that SMC 12A.14.080 was unconstitutionally applied to him.

## FACTS

¶3 Seattle Police Officer Michael Conners stopped a vehicle driven by Wayne Anthony Evans for speeding in the Central District of Seattle. As Conners approached Evans's vehicle, he observed furtive movements from Evans and his passenger, and he smelled marijuana. Conners directed Evans to exit the vehicle and asked him whether he had any weapons. Evans responded that there was a knife in his pocket. Conners instructed Evans not to reach for the knife; Conners then reached into Evans's front right pocket, retrieved a fixed-blade knife with a black handle, and placed Evans under arrest for possession of a fixed-blade knife.

¶4 The city of Seattle (City) charged Evans with the unlawful use of weapons in violation of SMC 12A.14.080(B).[2] The case proceeded to trial and the City introduced the knife into evidence and presented testimony from one witness, Con-

---

[1] Evans was charged under former SMC 12A.14.080 (1994). Since the changes do not affect our analysis, we cite to the current statute.

[2] SMC 12A.14.080(B) provides in part, "It is unlawful for a person knowingly to . . . carry concealed or unconcealed on his or her person any dangerous knife." A "dangerous knife" is defined as "any fixed-blade knife and any other knife having a blade more than 3 ½ inches in length." SMC 12A.14.010(C).

ners. Conners identified the knife that he recovered from Evans at trial and the State entered that knife into evidence. When asked, Conners described the knife as having a "black handle with a metal colored blade" that was "about—about this long," apparently gesturing with his hands. Conners admitted that he was concerned that the knife had a fixed blade—that is, it had a blade that would not fold into the handle—and alternately described the blade as resembling a "kitchen knife" or a "paring knife."[3] He also stated that the knife had a sheath in the form of a plastic cover on the blade.

¶5 The municipal court instructed the jury:

> Jury Instruction 3: A person commits the crime of Unlawful Use of Weapons when he or she knowingly carries a dangerous knife on his or her person.

> Jury Instruction 4: Dangerous knife means a knife, regardless of blade length, with a blade which is permanently open and does not fold, retract, or slide into the handle of the knife and includes a dagger, sword, bayonet, bolo knife, hatchet, ax, straight-edged razor or razor blade not in a package, dispenser, or shaving appliance.[4]

The jury returned a general verdict of guilty, and Evans's conviction was affirmed by the superior court and the Court of Appeals. *See City of Seattle v. Evans*, 182 Wn. App. 188, 327 P.3d 1303, *review granted*, 181 Wn.2d 1022, 339 P.3d 634 (2014).

¶6 We granted review and now affirm.

## ANALYSIS

¶7 Evans brings an as-applied challenge to SMC 12A.14.080, arguing that the statute's prohibition on carry-

---

[3] A "paring knife" is a common small, fixed-blade knife with a short handle and a blade of three to four inches; a 3 ½ inch blade is the most common size. NORMAN WEINSTEIN, MASTERING KNIFE SKILLS: THE ESSENTIAL GUIDE TO THE MOST IMPORTANT TOOLS IN YOUR KITCHEN 30 (2008). Paring knives are often described as being appropriate for cutting fruits and vegetables. *Id.*

[4] This instruction follows the language of chapter 12A.14 SMC but substitutes the definition of "fixed-blade knife" for that term as found in SMC 12A.14.010.

ing fixed-blade knives unconstitutionally infringes on his right to bear arms. In answering this challenge, the threshold question is whether Evans demonstrates that his fixed-blade knife is a protected arm under the Washington or federal constitution. Though we previously held that small, fixed-blade paring knives are not arms under the Washington Constitution, *City of Seattle v. Montana*, 129 Wn.2d 583, 919 P.2d 1218 (1996) (plurality opinion), Evans asks us to reconsider that holding in light of *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008).

■ ¶8  In considering whether paring knives are entitled to constitutional protection following *Heller*, we conduct a thorough survey of cases considering the protections afforded by the right to bear arms. Using principles and factors derived from *Heller*, *Montana*, and other courts to consider the scope of the term "arms," we hold that not all knives are constitutionally protected arms and that Evans does not demonstrate that his paring knife is an "arm" as defined under our state or federal constitution. Therefore, Evans cannot establish that SMC 12A.14.080(B) is unconstitutional as applied to him and we reject his as-applied challenge.[5]

I.  Standard of Review

■ ¶9  We review constitutional issues de novo. *State v. Gresham*, 173 Wn.2d 405, 419, 269 P.3d 207 (2012). We presume that statutes are constitutional and place " 'the

---

[5] This result stems from the limited scope of Evans's appeal. Evans argues only that the Seattle ordinance in question violates his right to bear arms. Amicus curiae Washington Association of Criminal Defense Lawyers newly raises the contention that the ordinance is unconstitutionally vague and thus violates the due process clause of the Fourteenth Amendment to the federal constitution and Washington Constitution, article I, section 3. But Evans never argued that the ordinance was vague, too broad, or improperly sweeps within its prohibitions innocuous objects like tools. This court "will not address arguments raised only by amicus." *Citizens for Responsible Wildlife Mgmt. v. State*, 149 Wn.2d 622, 631, 71 P.3d 644 (2003). Because Evans's appeal is based solely on his right to bear arms, the threshold question of whether the object carried in his pocket qualifies as a constitutionally protected arm is dispositive of his appeal.

burden to show unconstitutionality . . . on the challenger.' " *In re Estate of Hambleton*, 181 Wn.2d 802, 817, 335 P.3d 398 (2014) (alteration in original) (quoting *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 215, 143 P.3d 571 (2006)).

■ ¶10 " '[A]n as-applied challenge to the constitutional validity of a statute is characterized by a party's allegation that application of the statute in the specific context of the party's actions or intended actions is unconstitutional.' " *State v. Hunley*, 175 Wn.2d 901, 916, 287 P.3d 584 (2012) (alteration in original) (quoting *City of Redmond v. Moore*, 151 Wn.2d 664, 668-69, 91 P.3d 875 (2004)). " 'Holding a statute unconstitutional as-applied prohibits future application of the statute in a similar context, but the statute is not totally invalidated.' " *Id.* (quoting *Moore*, 151 Wn.2d at 669). "In contrast, a successful facial challenge is one where no set of circumstances exists in which the statute, as currently written, can be constitutionally applied." *Moore*, 151 Wn.2d at 669.

## II. Article I, Section 24 and *City of Seattle v. Montana*

■ ■ ¶11 We first consider Evans's argument that his paring knife is an arm under article I, section 24 of the Washington Constitution. *Accord State v. Coe*, 101 Wn.2d 364, 373-74, 679 P.2d 353 (1984) (we consider constitutional questions first under our own state constitution). Article I, section 24 of the Washington Constitution reads:

> The right of the individual citizen to bear arms in defense of himself, or the state, shall not be impaired, but nothing in this section shall be construed as authorizing individuals or corporations to organize, maintain or employ an armed body of men.

This "right to bear arms" is an individual right that exists in the context of that individual's defense of himself or the state. *State v. Sieyes*, 168 Wn.2d 276, 292-93, 225 P.3d 995 (2010). We considered but did not decide whether the scope of the term "arms" embraced knives in *City of Seattle v.*

*Montana. See* 129 Wn.2d at 591 ("In the absence of a *Gunwall* analysis on the question of whether, or what type of, knives constitute 'arms' under art. I, § 24, we decline to reach this question." (citing *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986))).

¶12 In *Montana*, this court considered a challenge to former SMC 12A.14.080 (1987), substantively the same ordinance at issue here. Alberto Montana was convicted of the unlawful use of a weapon for possessing a small, fixed-blade paring knife approximately three inches long. On appeal, he argued that former SMC 12A.14.080 violated his right to bear arms under article I, section 24 and that the ordinance was unconstitutionally vague or overbroad.

¶13 This court issued a divided opinion. The lead opinion held that the ordinance, which makes it "unlawful for a person knowingly to . . . [c]arry concealed or unconcealed on his/her person any dangerous knife," was a "reasonabl[e]" restriction on a citizen's "right to bear arms in defense of himself," as guaranteed by the Washington Constitution article I, section 24. Former SMC 12A.14.080(B); *Montana*, 129 Wn.2d at 599. Justice Alexander's concurrence rejected that view, opining that the lead opinion "incorrectly determines that the ordinance . . . passes muster under Washington's constitution when applied to a case where the knives are 'arms,' as that term was envisioned by the drafters of our state constitution." 129 Wn.2d at 600. His concurrence expressed the view that "the drafters of the state constitution intended, by [the] plain words [of Washington Constitution article I, section 24], absolutely to protect a person's right to carry arms for personal defense." *Id.* "Seattle's ordinance is such a broad prohibition on the possession and carrying of knives, including those that fall within the definition of 'arms,' that it is not . . . a 'reasonable regulation' [as the lead opinion would hold]." *Id.* The concurrence stated, "I fail to see how the ordinance can be considered constitutional when it is applied so as to prohibit the carrying of 'arms' for the purposes of self-defense." *Id.* at 600-01.

¶14 Nonetheless, five justices held that fixed-blade paring knives and small kitchen knives—such as the knife at issue in this case—are not protected arms under the Washington State Constitution. *See id.* at 599 (Durham, C.J., concurring, joined by Guy, J.), 601 (Alexander, J., concurring, joined by Johnson and Madsen, JJ.) (Montana's small paring knife is not an arm as it is neither a traditional nor a modern arm of self-defense). The four justices in the lead opinion declined to decide the issue but stated that "the term 'arms' extends only to weapons designed as such, and not to every utensil, instrument, or thing which might be used to strike or injure another person." *Id.* at 590-91 (quoting *State v. Nelson*, 38 La. Ann. 942, 946, 58 Am. Rep. 202 (1886)). Thus, under *Montana*, Evans's fixed-blade paring knife is not a protected arm under article I, section 24.[6]

III.   The Parameters of the Right To Bear Arms

■ ¶15 Evans urges us to reconsider *Montana* and hold that the term "arms" includes fixed-blade knives such as his paring knife. Evans also asserts that even if his knife is not protected under article I, section 24, *Montana* is abrogated and his knife is protected by the Second Amendment following the United States Supreme Court's holding in *Heller*. In order for us to reconsider our holding, Evans must demonstrate either that the decision is incorrect or harmful or that the legal underpinnings of the decision have

---

[6] We are mindful of—and expressly renew—the concern expressed in Justice Alexander's concurring opinion in *Montana*: many knives banned under the Seattle ordinance may be arms deserving constitutional protection. *See* 129 Wn.2d at 600. The problem that the concurrence identified was that "the ordinance exempts from its scope the carrying of knives while engaged in hunting, fishing, the culinary arts, and other lawful occupations, activities not protected by the constitution, yet does not exempt from its scope the carrying of arms for the purpose recognized in the statute constitution, self defense." *Id.* at 601. However, Evans's as-applied challenge does not establish that his knife is an arm and it does not establish that the ordinance is unconstitutional as applied to him. In a different case under appropriate facts, the ordinance's "broad prohibition" on carrying arms for purposes of self-defense may well be constitutionally infirm. *See id.* at 600-01 (Alexander, J., concurring). We reserve judgment on this issue for an appropriate case.

changed or disappeared altogether. *W.G. Clark Constr. Co. v. Pac. Nw. Reg'l Council of Carpenters*, 180 Wn.2d 54, 66, 322 P.3d 1207 (2014). Evans specifically argues that we must reconsider the parameters of the right to bear arms under the Washington Constitution in light of *Heller* and the protections afforded by the Second Amendment.

### A. Survey of the term "arms"

¶16 The Second Amendment to the United States Constitution reads, "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." As with article I, section 24, this guarantees an individual right to keep and bear arms. *Heller*, 554 U.S. at 592-94. This right is incorporated against the States. *McDonald v. City of Chicago*, 561 U.S. 742, 791, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) (plurality opinion); *see also Sieyes*, 168 Wn.2d at 291.

¶17 The United States Supreme Court discussed the parameters of the right protected by the Second Amendment in *Heller*. Though *Heller* specifically held that the right to bear arms extended to handguns, the Supreme Court defined the term "arms" to encompass all bearable arms that were common at the time of the founding and that could be used for self-defense. 554 U.S. at 581, 627. The court continued:

> The term [arms] was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity. For instance, Cunningham's legal dictionary gave as an example of usage: "Servants and labourers shall use bows and arrows on *Sundays*, &c. and not bear other arms."

*Id*. at 581 (quoting 1 A NEW AND COMPLETE LAW DICTIONARY (1771)). This definition is designed to protect an individual's right to carry a weapon for the particular purpose of confrontation. *Id*. at 592. However, this definition of "arms" still contemplates that an arm is a *weapon*. *Id*. at 581 ("the term [arms] was applied, then as now, to weapons . . . "); *see also*

*id.* (noting that Samuel Johnson's 1773 dictionary defined "arms" as " '[w]eapons of offense, or armour of defence' " (alteration in original) (quoting 1 Dictionary of the English Language 106 (4th ed.) (reprint 1978))).

¶18  This definition of "arms" under the federal constitution is not unlimited: "the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Id.* at 623 (citing *United States v. Miller*, 307 U.S. 174, 59 S. Ct. 816, 83 L. Ed. 1206 (1939)). Specifically, the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. *Id.* at 625. The Court then stated that the District of Columbia's handgun ban at issue in the case "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *Id.* at 628.

¶19  Evans's reliance on *Heller* is misplaced—an analysis of the term "arms" under the Second Amendment does not require a different result than noted above. *Heller* addressed a local ordinance that completely banned handguns in the home and is simply too different to provide useful guidance here. *See id.* at 636 (Second Amendment bars "the absolute prohibition of handguns held and used for self-defense in the home"). *Heller* does not address the use of knives carried for self-defense. *See Wooden v. United States*, 6 A.3d 833, 839 (D.C. 2010) ("*Heller* is focused exclusively on 'arms' or 'weapons,' meaning firearms when read in context.").

¶20  To the extent *Heller* might be applied here, it supports the notion that the small fixed-blade knife found in Evans's front pocket does not qualify as an arm under the Second Amendment. As noted above, *Heller* unremarkably observes that "firearms constitute[ ] arms," but further defines "arms" in part as " '[w]eapons of offence.' " *Heller*, 554 U.S. at 581 (first alteration in original) (quoting 1A Dictionary of the English Language, *supra*, at 106). As the *Heller* Court observed, "[T]he most natural reading of 'keep

Arms' in the Second Amendment is to 'have weapons.' " *Id.* at 582.

¶21 Several state courts have applied *Heller*'s analysis of handguns as "arms" in considering whether the right to bear arms extends to other objects ostensibly used for self-defense.[7] Relevant here, the Connecticut Supreme Court used the *Heller* analysis to determine whether a dirk knife—a long, straight-bladed dagger—was a bearable arm protected under the federal constitution. *State v. DeCiccio*, 315 Conn. 79, 117, 105 A.3d 165 (2014). Specifically, the court considered the "military origins," "history," and "purpose" of the dirk knife, comparing the dirk knife at times to a bayonet or short sword.[8] *Id.* at 119-24. The court noted that the history of dirk knives "is consistent with the American military usage of knives in general," tracing the dagger from its 18th century Scottish origins through to the United States Marine Corps "Ka-Bar fighting knife" issued in World War II to the weapon in the case before them. *Id.* at 121-22. The court further concluded that dirk knives are not " 'dangerous and unusual' " weapons and that DeCiccio's dirk knife fell within the term "arms" under the Second Amendment. *Id.* at 128.

¶22 Oregon considered the text and history of its own state constitution's article I, section 27 in order to determine the meaning of the term "arms." *See State v.*

---

[7] We are aware of four states that have considered the parameters of the term "arms" following *Heller. See Commonwealth v. Caetano*, 470 Mass. 774, 781, 26 N.E.3d 688 (2015) (stun guns are not protected arms under the Second Amendment because they were not in common use at the enactment of the amendment and are considered per se dangerous at common law); *State v. DeCiccio*, 315 Conn. 79, 117, 105 A.3d 165 (2014) (police baton and dirk knife are constitutionally protected arms); *Lacy v. State*, 903 N.E.2d 486 (Ind. Ct. App. 2009) (switchblade is not a weapon typically possessed by law-abiding citizens for self-defense purposes); *People v. Davis*, 214 Cal. App. 4th 1322, 1331, 155 Cal. Rptr. 3d 128 (2013) (defendant failed to establish that billy club is a weapon typically possessed by lawful citizens for a lawful purpose).

[8] *DeCiccio* also considered the history, traditional use, and function of a police baton in holding that it is "the kind of weapon traditionally used by the state for public safety purposes" and therefore protected under the Second Amendment. 315 Conn. at 129-34.

*Kessler*, 289 Or. 359, 361-70, 614 P.2d 94 (1980). Washington's article I, section 24 was drawn from Oregon's article I, section 27 and the constitution proposed by W. Lair Hill. ROBERT F. UTTER & HUGH SPITZER, THE WASHINGTON STATE CONSTITUTION: A REFERENCE GUIDE 39 (2002). Indeed, though we frequently decline to decide the parameters of the right guaranteed by our own article I, section 24, we have cited with approval to the Oregon Supreme Court's interpretation of its analogous provision. *See, e.g., State v. Rupe*, 101 Wn.2d 664, 707, 683 P.2d 571 (1984) (plurality opinion) (citing *Kessler*, 289 Or. 359, with approval); *Montana*, 129 Wn.2d at 601 n.9 (citing *State v. Delgado*, 298 Or. 395, 400-01, 692 P.2d 610 (1984)).

¶23 The Oregon Supreme Court has interpreted article I, section 27 of the Oregon Constitution to protect objects as "arms" when the object is "a kind of weapon, as modified by its modern design and function, [which] is of the sort commonly used by individuals *for personal defense* during either the revolutionary and post-revolutionary era, or in 1859 when Oregon's constitution was adopted." *Delgado*, 298 Or. at 400-01 (emphasis added) (footnote omitted); *State v. Christian*, 354 Or. 22, 30, 307 P.3d 429 (2013) (citing *Kessler*, 289 Or. 359). The Oregon Supreme Court has applied this definition in considering whether a billy club, a switchblade knife, and a loaded firearm are constitutionally protected arms. *Kessler*, 289 Or. 359 (billy club); *Delgado*, 298 Or. 395 (switchblade knife); *Christian*, 354 Or. 22 (loaded firearm).

¶24 In *Delgado*, Oregon specifically applied the definition of "arms" discussed above in considering whether switchblade knives—a type of jackknife with a blade between four and seven inches that folds into the handle and is released by a spring mechanism—are arms under article I, section 27. 298 Or. at 402-03. In answering this question, the court conducted a thorough historical analysis of the use of "fighting knives" in America and concluded that certain knives, including switchblade knives, have been

commonly used for self-defense. *Id.* at 400-03. The court then held that switchblades were arms under article I, section 27. *Id.* at 403.

### B. Defining "arms"

¶25 We have never decided the parameters of the right to bear arms. *See Rupe*, 101 Wn.2d at 706-07 ("Although we do not decide the parameters of this right here, defendant's behavior—possession of legal weapons—falls squarely within the confines of the right guaranteed by Const. art. 1 § 24."); *Montana*, 129 Wn.2d at 591. That question is properly before us now.

¶26 We hold that the right to bear arms protects instruments that are designed as weapons traditionally or commonly used by law-abiding citizens for the lawful purpose of self-defense. In considering whether a weapon is an arm, we look to the historical origins and use of that weapon, noting that a weapon does not need to be designed for military use to be traditionally or commonly used for self-defense. We will also consider the weapon's purpose and intended function.

¶27 Contrary to Evans's assertions, this approach—which is rooted in the United States Supreme Court's decision in *Heller* and the Oregon Supreme Court's interpretation of its state constitution's article I, section 27—is fully consistent with our opinion in *Montana*. In particular, Oregon's focus on historical use and function supports the idea, expressed by the lead opinion in *Montana* and relied on by the concurring opinions thereto, that not all knives are "arms." *Montana*, 129 Wn.2d at 590-91 ("Under even the broadest possible construction, the term 'arms' extends only to weapons designed as such, and not to every utensil, instrument, or thing which might be used to strike or injure another person."). It is, in fact, this definitional approach that resulted in our holding that fixed-blade paring knives and small kitchen knives are not protected arms under the Washington State Constitution:

Notwithstanding my disagreement with the majority, I concur in the result it reaches here because I am satisfied that the knives possessed by McCullough and Montana are not arms. Although certain objects that could fall into the generic definition of a dangerous knife may well be considered arms, the knives possessed by McCullough and Montana (a small paring knife and a filleting knife) are not, in my opinion, either traditional or modern arms of self-defense. Therefore, they are not afforded protected status by article I, section 24 of the state constitution.

*Id.* at 601 & n.9 (Alexander, J., concurring) (citing *Delgado*, 298 Or. 395, for the proposition that "historically, certain knives, for example, bowie knives and swords, have been commonly used for self-defense and, therefore, may be considered arms under article I, section 27 of the Oregon Constitution").[9]

¶28 Evans does not demonstrate that our opinion in *Montana* is incorrect or harmful or that the legal underpinnings of the decision have changed. A survey of the relevant case law suggests instead that *Montana* provides an appropriate framework for analyzing the right to bear arms that is both useful and true to the purpose of that right. Further, the opinion is consistent with *Heller* and the decisions of other courts post-*Heller*. We therefore reject Evans's invitation to reconsider *Montana*.

IV.   Evans's Knife Is Not a Protected "Arm"

██ ██ ¶29 With this framework in mind, we turn to Evans's as-applied challenge to SMC 12A.14.080. Evans asserts that his knife is a constitutionally protected arm and that the ordinance's prohibition against carrying fixed-blade knives is unconstitutional as applied to him. We hold that Evans cannot establish that SMC 12A.14.080 is un-

---

[9] Notably, *Heller* also cites favorably to the Oregon Supreme Court's discussion of lawful arms in *Kessler*. *See* 554 U.S. at 624-25. Additionally, the Connecticut Supreme Court recently noted that Oregon's definitional approach "mirrors the model employed by the United States Supreme Court in [*Heller*]." *DeCiccio*, 315 Conn. at 117.

constitutional as applied to him because his paring knife is not a constitutionally protected arm.

¶30  Evans does not attempt to establish that his paring knife is a weapon designed and traditionally used for self-defense. Indeed, he offers no meaningful distinction between his paring knife and the paring knife at issue in *Montana*. He instead argues that all fixed-blade knives are constitutionally protected arms following *Heller* and that his paring knife is thus protected because it is a fixed-blade knife. To make this argument, Evans relies on language in *Heller* asserting that the term "arms" encompasses "weapons that were not specifically designed for military use and were not employed in a military capacity." *Heller*, 554 U.S. at 581. He is correct that the Second Amendment protects the right to possess weapons designed for personal protection as well as for use in a militia. *Id*. at 581, 592. But this cannot be understood to grant a right for citizens to possess anything that may plausibly be used for self-defense—the Second Amendment protects the right to carry a *weapon* for self-defense. *Id*.

¶31  Evans also relies on *DeCiccio* and *Delgado* to reinforce his argument that all fixed-blade knives are arms.[10] Neither case supports that interpretation: both cases rely on an extensive historical and functional analysis of the specific knife at issue, and *DeCiccio* expressly limits its holding to "knives with characteristics of the dirk knife at issue in the present case." *DeCiccio*, 315 Conn. at 128 n.34; *Delgado*, 298 Or. at 400-03. The lengthy historical analysis and specific limiting language of both opinions actually undermine Evans's argument and reinforce our conclusion that some knives are not arms.

---

[10] We are aware of no decision holding that all knives are constitutionally protected arms, regardless of historical use, origin, purpose, or function. Even advocates of the position that knives should broadly be considered bearable arms following *Heller* also acknowledge that some knives are designed as tools or utensils and are therefore not entitled to constitutional protection. *See, e.g.*, David B. Kopel, Clayton E. Cramer & Joseph Edward Olson, *Knives and the Second Amendment*, 47 U. Mich. J.L. Reform 167, 194 n.146 (2013).

¶32 Evans compounds this error by setting up a false equivalence between the dirk knife at issue in *DeCiccio* and the paring knife at issue in his own case. Highlighting the *DeCiccio* court's holding that dirk knives are constitutionally protected arms because they are weapons designed for and historically used in battle, Evans points out a passage in *American Knives* suggesting that dirk knives are "equally useful for meals." *See* Harold L. Peterson, American Knives: The First History and Collectors' Guide 19 (1958). Evans then points out that kitchen knives are useful for meals—they are inarguably designed and generally used for culinary purposes. However, he also asserts that kitchen knives may be and have been used for self-defense. Thus, he reasons that both dirk knives and paring knives are constitutionally protected arms because both may be used for multiple purposes, including self-defense.

¶33 This reasoning ignores the origins, use, purpose, and function of both knives. It is true that some weapons may be used for culinary purposes, as it is also true that many culinary utensils may be used when necessary for self-defense; but it does not follow that all weapons are culinary utensils or that all culinary utensils are weapons. Were we to adopt Evans's analysis and hold that a kitchen knife was a protected arm because it could be used for self-defense, there would be no end to the extent of utensils arguably constitutionally protected as arms. If a kitchen knife is a protected arm, what about a rolling pin, which might be effectively wielded for protection or attack? Or a frying pan? Or a heavy candlestick? "Admittedly, any hard object can be used as a weapon, but it would be absurd to give every knife, pitchfork, rake, brick or other object conceivably employable for personal defense constitutional protection as 'arms.'" *Montana*, 129 Wn.2d at 591 n.2.

¶34 Both the federal and state constitutions require us to give protection to certain weapons that have been designed and commonly used for self-defense. *Heller*, 554 U.S. at 581-82; *Kessler*, 289 Or. at 368-69. The Connecticut

Supreme Court persuasively holds that dirk knives satisfy these criteria and are constitutionally protected arms. However, the small knife found on Evans's person is a utility tool, not a weapon. While almost any common object may be used as a weapon, that does not necessarily mean that possession of otherwise innocuous objects that could be wielded with malice will trigger the constitutional protections afforded to "arms." *See Montana*, 129 Wn.2d at 590-91, 599 (Durham, C.J., concurring), 601 (Alexander, J., concurring). Evans does not demonstrate that his paring knife is a constitutionally protected arm. We therefore reject his as-applied challenge.

## CONCLUSION

¶35 We affirm the Court of Appeals but on different grounds, holding that Evans's paring knife is not an arm entitled to constitutional protection. Therefore, Evans cannot establish that SMC 12A.14.080 is unconstitutional as applied to him and we affirm the decision of the Court of Appeals.

MADSEN, C.J., and STEPHENS, GONZÁLEZ, and YU, JJ., concur.

¶36  FAIRHURST, J. (dissenting) — I dissent because I believe that as applied to Wayne Anthony Evans, a law-abiding citizen carrying a fixed-blade knife for self-defense, former[11] Seattle Municipal Code (SMC) 12A.14.080 (1994)[12] violates the right to bear arms under the Second Amendment to the United States Constitution. Contrary to the majority, I

---

[11] The Seattle Municipal Code (SMC) was amended in September 2010 and recently in November 2014. Because Evans violated the SMC in February 2010, he was charged under the SMC in effect at that time, which was enacted in 1994. The changes made to the SMC since 1994 were primarily to the format of the ordinance and did not change it substantively.

[12] Former SMC 12A.14.080(B) sets forth the general prohibition on carrying dangerous knives but relies on former SMC 12A.14.010(A) and (B) (1994) to provide definitions for "dangerous knife" and "fixed-blade knife." Given the interdependence of these provisions, I refer to them in the text collectively as the "SMC."

would hold that there is insufficient evidence to determine whether the fixed-blade knife that Evans carried is a paring knife, but that our holding in *City of Seattle v. Montana*, 129 Wn.2d 583, 919 P.2d 1218 (1996) (plurality opinion) must be abrogated following *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). Consistent with *Heller*, I would also hold that the SMC is presumptively unconstitutional. Alternatively, I would subject the SMC to a heightened means-end test. I would hold that strict scrutiny is the proper test and that the SMC is too broad to withstand such scrutiny.

¶37 The SMC makes it unlawful for a person to knowingly "[c]arry concealed or unconcealed on his or her person any dangerous knife, or carry concealed on his or her person any deadly weapon other than a firearm." Former SMC 12A.14.080(B). The term "dangerous knife" is defined as "*any* fixed-blade knife and any other knife having a blade more than three and one-half inches (3 1/2") in length." Former SMC 12A.14.010(A) (emphasis added). A "fixed-blade knife" is

> *any* knife, regardless of blade length, with a blade which is permanently open and does not fold, retract or slide into the handle of the knife, and includes any dagger, sword, bayonet, bolo knife, hatchet, axe, straight- edged razor, or razor blade not in a package, dispenser or shaving appliance.

Former SMC 12A.14.010(B) (emphasis added). The SMC has three exemptions, none of which are applicable here.[13]

---

[13] The SMC's prohibition on carrying dangerous knives does not apply to the following:

  A.   A licensed hunter or licensed fisherman actively engaged in hunting and fishing activity including education and travel related thereto; or

  B.   Any person immediately engaged in an activity related to a lawful occupation which commonly requires the use of such knife, provided such knife is carried unconcealed; provided further that a dangerous knife carried openly in a sheath suspended from the waist of the person is not concealed within the meaning of this subsection;

  C.   Any person carrying such knife in a secure wrapper or in a tool box while traveling from the place of purchase, from or to a place of repair, or from

¶38 From the facts established at the trial court, Evans was carrying, for personal protection, a fixed-blade knife with a black handle and a metal colored blade. The fact that Evans carried the knife for self-defense is undisputed. Therefore, in order to be entitled to relief under an as-applied challenge, Evans must prove beyond a reasonable doubt that his conviction under the SMC for carrying a fixed-blade knife for personal protection was a violation of his constitutional right to bear arms. *In re Welfare of A.W.*, 182 Wn.2d 689, 701, 344 P.3d 1186 (2015) (citing *Sch. Dists.' All. for Adequate Funding of Special Educ. v. State*, 170 Wn.2d 599, 605, 244 P.3d 1 (2010)).

¶39 The state and federal rights to bear arms are different and mandate separate interpretation. *State v. Jorgenson*, 179 Wn.2d 145, 152, 312 P.3d 960 (2013). Where possible, this court resolves state constitutional questions first before turning to federal questions. *Id.*

A.  Right to bear arms under article I, section 24 of the Washington Constitution

¶40 According to the majority, this court's precedent interpreting article I, section 24 dictates that the fixed-blade knife that Evans carried is not a protected arm under the Washington Constitution. However, therein lies the problem.

¶41 This court issued a divided opinion in *Montana*, where it considered a similar challenge to former SMC 12A.14.080 (1987), but did so exclusively under article I, section 24. The four justices who signed the lead opinion found that the SMC did not violate the state constitution because it was a reasonable regulation under the state's police powers. *Montana*, 129 Wn.2d at 592. The lead opinion, however, declined to reach the question of whether

---

or to such person's home or place of business, or in moving from one (1) place of abode or business to another, or while in such person's place of abode or fixed place of business.

SMC 12A.14.100.

knives constitute "arms" under article I, section 24. *Id*. at 591. While the lead opinion did not decide whether the knives at issue were arms, it did state that "the term 'arms' extends only to weapons designed as such, and not to every utensil, instrument, or thing which might be used to strike or injure another person." *Id*.

¶42 Between the two concurrences in *Montana*, five justices of this court agreed that the knives—a filleting knife and a small paring knife—did not qualify as arms for purposes of article I, section 24. Two justices concurred in the result of the lead opinion, but on the limited basis that the knives were not arms for purposes of article I, section 24. *Id*. at 599 (Durham, C.J., concurring). Three justices also agreed that the knives at issue were not arms, but expressed concern that in a different case the SMC could unreasonably restrict a citizen's right to carry arms for self-defense. *Id*. at 600-01 (Alexander, J., concurring). Justice Alexander also expressed concern that the SMC lacked, as it continues to lack, an exemption for carrying arms "for the purpose recognized in the state constitution, self-defense." *Id*. at 601 (Alexander, J., concurring). Nevertheless, the five concurring justices reasoned that while certain knives covered by the SMC could be considered arms, the knives possessed by the petitioners in *Montana* were not arms. *Id*. Because five justices agreed that the knives in question were not arms under article I, section 24, this court's holding in *Montana* is that the ordinary knives possessed by the petitioners in that case are not arms under article I, section 24. *See State v. Valdez*, 167 Wn.2d 761, 775, 224 P.3d 751 (2009) (noting that the narrowest ground on which a majority agrees represents the holding of the case); *see also Wright v. Terrell*, 162 Wn.2d 192, 195, 170 P.3d 570 (2007).

¶43 I disagree with the majority's conclusion that the *Montana* court's holding provides "an appropriate framework . . . that is both useful and true to the purpose of that right." Majority at 870. As noted above, the only prece-

dential holding in *Montana* was that the knives in that case were not arms under article I, section 24. Given the splintered decision in *Montana*, it offers little analysis for evaluating what constitutes an arm under article I, section 24 of the Washington Constitution. In my view, especially following *Heller*, this court must provide a clear model for evaluating whether an object can be considered an arm. This model must satisfy the requirements of the Washington Constitution and must also be consistent with the Second Amendment. The *Montana* decision provides no such guidance. The majority's attempt to reconcile its decision with *Montana* serves only to complicate the analysis, particularly in light of *Montana*'s exceedingly narrow holding.

¶44 The record here presents differing descriptions of the knife Evans carried, casting doubt on the majority's conclusion. The arresting officer described the length of Evans' knife blade, but the actual length was never established in the record. We know only that the knife was of a size that would fit into the front pocket of the pants Evans wore on the night of his arrest. The officer testified that the knife had a black handle with a metal colored blade, was covered in a plastic sheath, and had a fixed blade. This description could define any number of knives, some of which would undoubtedly be entitled to protection. The officer also provided the alternate description that the knife resembled a kitchen knife or paring knife. The officer never elaborated on his basis for labeling Evans' knife a kitchen knife, nor did the officer ever state what constituted a kitchen knife or paring knife in his opinion. Unfortunately, Evans' knife was destroyed following his jury trial, so only the trial court had the opportunity to view it.

¶45 Based on the facts established at trial, I cannot so easily classify Evans' knife as a paring knife. I think it unwise to base an analysis on an uncertain fact, but because Evans' Second Amendment claim is determinative, resolution of the exact type of knife is unnecessary. Without

resolving whether Evans' knife fits into the category of unprotected knives defined in *Montana*, the fact that Evans possessed a fixed-blade knife for self-defense is sufficient for this inquiry. This is especially true in light of the *Heller* Court's recognition that the Second Amendment protects an individual's right to keep and bear arms for the purpose of self-defense.

¶46 The federal constitution operates as a floor that the state constitutional protections cannot fall beneath. *State v. Sieyes*, 168 Wn.2d 276, 292, 225 P.3d 995 (2010). The Washington Constitution can offer greater or equal protections, but it may not offer lesser protections than its federal counterpart. *Id*. While this court reviews the state and federal constitutional provisions separately, if Evans can successfully show that the SMC violates his Second Amendment right to bear arms, it would abrogate our decision in *Montana*, making his state constitutional challenge moot. Thus, even accepting that Evans' knife should be classified as a kitchen knife and that it is therefore unprotected given *Montana*'s limited holding, this court must still determine whether Evans' knife is protected under the Second Amendment.

B. Right to bear arms under the Second Amendment

¶47 Evans' federal challenge controls the outcome of this case. In matters of federal law, this court is bound by the decisions of the United States Supreme Court. *W.G. Clark Constr. Co. v. Pac. Nw. Reg'l Council of Carpenters*, 180 Wn.2d 54, 62, 322 P.3d 1207 (2014). "Decisions of the federal circuit courts are 'entitled to great weight' but are not binding." *Id*. (quoting *Home Ins. Co. of N.Y. v. N. Pac. Ry. Co.*, 18 Wn.2d 798, 808, 140 P.2d 507 (1943)).

¶48 In *Heller*, the Supreme Court held that the District of Columbia ordinance completely prohibiting citizens from carrying handguns in their homes violated the Second Amendment. 554 U.S. at 636. The Court found that the amend-

ment was divided into two parts—a prefatory clause[14] and an operative clause.[15] *Id.* at 577. "[T]he Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense." *Id.* at 599. The right to self-defense is central to the Second Amendment, the core of which is to protect oneself in the home. *Id.* at 628-30. Therefore, the Court held that the handgun ban at issue, which amounted to a prohibition of an entire class of arms used by law-abiding Americans for self-defense, was unconstitutional under any level of scrutiny. *Id.* at 628. The Court noted that the right to bear arms is not unlimited and that there is a historical tradition of prohibiting the carrying of dangerous and unusual weapons. *Id.* at 626-27.

¶49 "*Heller* aptly has been characterized as having adopted a 'two-pronged approach to [s]econd [a]mendment challenges.'" *State v. DeCiccio*, 315 Conn. 79, 111, 105 A.3d 165 (2014) (alterations in original) (quoting *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)); *Peruta v. County of San Diego*, 742 F.3d 1144, 1150 (2014). First, the court should ask whether the challenged law imposes a burden on conduct that falls within the scope of the Second Amendment. *Peruta*, 742 F.3d at 1150. If it does, the court must next evaluate the law under some form of means-end scrutiny to determine if the law infringes on the Second Amendment right. *Id.* If the law passes the scrutiny then it is constitutional; if the law fails, it is invalid. *Id.*

### 1. *Scope of the Second Amendment*

¶50 To examine the scope of the Second Amendment, the proper inquiry asks if the restricted activity—here, the

---

[14] "A well regulated militia being necessary to the security of a free state." U.S. CONST. amend. II.

[15] "[T]he right of the people to keep and bear arms, shall not be infringed." *Id.*

carrying of a fixed-blade knife in public by a law-abiding citizen for self-defense—falls within the scope of Second Amendment protections. Although the holding in *Heller* leaves open the questions of whether a knife is considered an arm under the Second Amendment and whether the right to defend oneself extends beyond the home, other pre- and post-*Heller* courts have considered these issues.

a) A fixed-blade knife is an arm under the Second Amendment

¶51 The Court in *Heller* found that the Second Amendment protections extend to only certain types of weapons. 554 U.S. at 627. Evans asks us to find that the knife he carried is an arm subject to the protection of the Second Amendment.

¶52 In *Heller*, the Court not only held that the Second Amendment protects an individual right but also set forth definitions for the amendment's terms. *Id.* at 581. *Heller* clarified that the term "arm" is defined broadly to encompass all bearable arms that were common at the time of the founding and could be used for self-defense. *Id.* at 582, 627. The Court stated that the term "arm" has the same meaning today as it did in the 18th century. *Id.* According to 18th century dictionaries, "arms" were defined as " '[w]eapons of offence, or armour of defence.' " *Id.* at 581 (alteration in original) (quoting 1 Dictionary of the English Language 106 (4th ed.) (reprint 1978)). In addition, the term "arm" is defined as " 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' " *Id.* (quoting 1 A New and Complete Law Dictionary (1771)). Further, the Court found the term "arms" was not limited to weapons that were specifically designed for military use, and the phrase " 'keep and bear arms' " does not have a special military meaning. *Id.* at 592 (quoting 49 *The London Magazine or Gentlemen's Monthly Intelligencer* 467 (1780)). To "keep arms" means to have or possess a weapon. *Id.* at 582. To "bear arms" means to carry a weapon

for the particular purpose of confrontation. *Id.* at 583. The Court noted that the protections of the Second Amendment extend to all instruments that constitute bearable arms. *Id.* at 582.

¶53 As explained above, Washington case law does not resolve the question of whether a fixed-blade knife is an arm under the Second Amendment, nor did the Supreme Court specifically address this question in *Heller*. However, sister states have considered the issue.

¶54 In an as-applied challenge, the Connecticut Supreme Court in *DeCiccio* recently held that a fixed-blade dirk knife[16] is an arm under the Second Amendment.[17] 315 Conn. at 128. The court in *DeCiccio* was guided by the definition of "arm" set forth in *Heller* and the analytical approach articulated in *Heller* and *State v. Delgado*, 298 Or. 395, 692 P.2d 610 (1984). *DeCiccio*, 315 Conn. at 128. In *Delgado*, a pre-*Heller* decision, the Oregon Supreme Court held that a switchblade knife was an arm for purposes of the Oregon Constitution.[18] 298 Or. at 403. " 'The appropriate inquiry . . . is whether the weapon, as modified by its modern design and function, is of the sort commonly used by individuals for personal defense during either the revolutionary or post-revolutionary era.' " *DeCiccio*, 315 Conn. at 118 (quoting *Delgado*, 298 Or. at 400-01). In *Delgado*, the Oregon Supreme Court examined various books discussing the history and use of knives to

---

[16] " 'A dirk is a long straight-bladed dagger or short sword usually defined by comparison [to] the ceremonial weapons carried by Scottish highlanders and naval officers in the [e]ighteenth and [n]ineteenth [c]enturies.' " *DeCiccio*, 315 Conn. at 121 (alterations in original) (quoting *Commonwealth v. Miller*, 22 Mass. App. Ct. 694, 695, 497 N.E.2d 29 (1986)).

[17] Relevant here, DeCiccio claimed that the statute violated his Second Amendment right by prohibiting him from using a vehicle to transport weapons for the purpose of moving to a new residence. *DeCiccio*, 315 Conn. at 128. After applying intermediate scrutiny, the court agreed with DeCiccio and held that the statute unconstitutionally infringed on his Second Amendment right. *Id.*

[18] Article I, section 27 of the Oregon Constitution states that "[t]he people shall have the right to bear arms for the defence of themselves, and the State, but the Military shall be kept in strict subordination to the civil power."

determine that the switchblade knife was used for both labor and combat and found that knives generally have played an important role in American life since the founding.[19] *Delgado*, 298 Or. at 401-03.

¶55 The *DeCiccio* court completed a similar historical inquiry and found that knives were important for American soldiers and that dirk knives in particular were used by soldiers in the American military. 315 Conn. at 119. Moreover, consistent with *Heller*, the court found that dirk knives were not dangerous or unusual weapons, excluding them from Second Amendment protections. *Id*. at 122. In its reasoning, the court noted that dirk knives have a limited lethality, especially compared to handguns, and that long-blade knives, like dirk knives, were common for militia purposes. *Id*. at 120, 123. Therefore, the court found that dirk knives fell into the category of weapons protected by the Second Amendment. *Id*. at 128.

¶56 I would apply a similar framework to the one used by the court in *DeCiccio* to determine whether a particular weapon is an arm under the Second Amendment. My approach would ask two questions: First, does the weapon at issue satisfy the broad definition of an "arm" as set forth in *Heller*? In other words, is the weapon a bearable arm according to the 18th century definition? If not, the inquiry ends. If yes, then the second question asks, is the weapon of the type protected by the Second Amendment? This involves assessing whether people used an analogous weapon for self-defense at the time of the founding. As part of this assessment, the evaluating court must determine whether the weapon was "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. If the weapon is dangerous or unusual, it is not protected by the Second Amendment. *Id*. at 627. *Heller*'s definition of "arms" and the

---

[19] Both *Delgado* and *DeCiccio* provide a detailed historical inquiry and examination of the use of knives, which we do not find necessary to repeat. *See Delgado*, 298 Or. at 401-04; *DeCiccio*, 315 Conn. at 112-23; *see also State v. Kessler*, 289 Or. 359, 369-70, 614 P.2d 94 (1980).

corresponding analysis differ from the *Montana* language relied on by the majority.[20] Because the *Heller* definition protects a broader range of items as arms, this court should abrogate *Montana*.

¶57 I would find that a fixed-blade knife carried for self-defense falls within the scope of Second Amendment protections. A fixed-blade knife is a bearable arm according to the Court's definition in *Heller*. Knives can be carried by an individual and used as a weapon. *See* David B. Kopel, Clayton E. Cramer & Joseph Edward Olson, *Knives and the Second Amendment*, 47 U. MICH. J.L. REFORM 167, 191-92 (2013). Furthermore, although militia use is not necessary to show that an item is a Second Amendment arm, militia use is sufficient to do so, and scholars have recognized that "[k]nives are indisputably militia arms." *Id*. at 192. Sources discussing the history of knives demonstrate that fixed-blade knives were traditionally used for many purposes, including self-defense. *See* HAROLD L. PETERSON, AMERICAN KNIVES: THE FIRST HISTORY AND COLLECTORS' GUIDE 19-21 (1958).

¶58 A fixed-blade knife satisfies the second part of the inquiry because citizens commonly used knives at the time of the founding. *See Delgado*, 298 Or. at 401 (Oregon Supreme Court noting that every colonist had a knife that was used for self-defense, as well as to obtain food and fashion raw materials); *DeCiccio*, 315 Conn. at 189 (finding that knives have been a traditional part of American military equipment). Because fixed-blade knives were used by citizens for many purposes, including self-defense, they are not dangerous or unusual weapons and are therefore protected by the Second Amendment, consistent with the Court's decision in *Heller*.[21] 554 U.S. at 626-27.

---

[20] "[T]he term 'arms' extends only to weapons designed as such, and not to every utensil, instrument, or thing which might be used to strike or injure another person." *Montana*, 129 Wn.2d at 591.

[21] Consistent with this analysis but reaching the opposite holding, the Massachusetts Supreme Court recently held that a stun gun was not within the scope of the Second Amendment protections because it was not in common use at the time

### b) The scope of the Second Amendment protection extends beyond the home

¶59 In *Heller*, the Supreme Court held that the core of the Second Amendment is the protection of the right to defend oneself inside the home. *Id.* at 630. Evans asserts that the right extends to protect one's right to bear arms outside of the home for self-defense. The Supreme Court has yet to address the issue. *See Moore v. Madigan*, 702 F.3d 933, 945 (7th Cir. 2012). As support for his argument, Evans primarily relies on *Peruta*.

¶60 In *Peruta*, the Ninth Circuit Court of Appeals addressed a challenge to the San Diego County policy that required an applicant to demonstrate good cause for a permit to carry a concealed weapon. 742 F.3d at 1148. The plaintiffs asserted that the county's interpretation of the good cause requirement infringed on their right to bear arms under the Second Amendment by denying them a permit to carry a concealed weapon for self-defense. *Id.* The federal district court assumed, without deciding, that the right to bear arms applied outside of the home but found that the law survived intermediate scrutiny. *Id.* On appeal, the Ninth Circuit held that the right to bear arms extends outside the home if the arm is carried for self-defense by a law-abiding citizen. *Id.* at 1160.

¶61 Acknowledging that the *Heller* decision was not dispositive, the *Peruta* court followed the framework established in *Heller* to determine the constitutionality of the restrictions on carrying a firearm outside the home. *Id.* at 1150-52. The court began by examining the terms of the Second Amendment in their historical context. *Id.* The *Peruta* court stated that the definition of "bear" in the Second Amendment was to " 'wear, bear, or carry . . . upon the person or in the clothing or pocket, for the purpose . . .

---

of the enactment of the amendment and was considered per se dangerous at common law. *Commonwealth v. Caetano*, 470 Mass. 774, 781, 26 N.E.3d 688 (2015).

of being armed and ready for offensive or defensive action in a case of conflict with another person.' " *Id.* at 1152 (alterations in original) (internal quotation marks omitted) (quoting *Heller*, 554 U.S. at 584). Putting the term "bear" into context, the *Peruta* court found that one does not "bear arms" only in the own home for protection. *Id.* The court noted that historically, frontiersmen would not leave the house without bearing arms for self-defense. *Id.* Additionally, the *Peruta* court found the Court's assertion in *Heller* that the Second Amendment right is most acute in the home implies that the right must exist outside the home. *Id.* The *Peruta* court held that the plain meaning of the term "bear arms" leads to no other conclusion than the scope of the Second Amendment extends outside of the home. *Id.* at 1154.

¶62 In addition to a textual analysis of the Second Amendment, the *Peruta* court undertook a historical analysis to determine the original public understanding of the amendment's scope and meaning. *Id.* at 1153-54. In reviewing historical texts from the time of the founding through the early 19th century, the court noted that "several important constitutional treatises in circulation at the time of the Second Amendment's ratification" supported *Heller*'s definition of "bear arms." *Id.* at 1154. The *Peruta* court also found that the majority of 19th century courts agreed that the Second Amendment right extended outside the home and included, at a minimum, the right to carry an operable weapon for the purpose of lawful self-defense. *Id.* at 1160. At the conclusion of the court's textual and historical analysis, it found that "the carrying of an operable handgun outside the home for the lawful purpose of self-defense, though subject to traditional restrictions, constitutes 'bear-[ing] Arms' within the meaning of the Second Amendment." *Id.* at 1166 (alteration in original). The court found that the right to carry a firearm outside the home for self-defense is part of the core right of the Second Amendment. *Id.* at 1167. Because the *Peruta* court found that San Diego County's

law restricted a "typical responsible, law-abiding citizen to bear arms in public for the lawful purpose of self-defense," the law was unconstitutional under any level of scrutiny. *Id.* at 1169.

¶63 The court in *Peruta* was correct that the Second Amendment's language may imply that right. *Id.* at 1152; *see also Drake v. Filko*, 724 F.3d 426, 430 (3d Cir. 2013); *Moore*, 702 F.3d at 942 (finding that the right to bear arms for self-defense is just as important outside the home as inside the home); *United States v. Masciandaro*, 638 F.3d 458, 468 (4th Cir. 2011) (Niemeyer, J., specially concurring) ("Consistent with the historical understanding of the right to keep and bear arms outside the home, the *Heller* Court's description of its actual holding also implies that a broader right exists."); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1515 (2009) (explaining post-*Heller*, albeit in the context of firearms: "self-defense has to take place wherever the person happens to be," which is not limited to one's home).

¶64 However, not all courts have found that the right to carry an arm outside the home for self-defense is a part of the core right of the Second Amendment, as the *Peruta* court did. *See Drake*, 724 F.3d at 430-31 (refusing to extend core protections from *Heller* outside the home but acknowledging there could be some Second Amendment protection outside of the home); *Kachalsky v. County of Westchester*, 701 F.3d 81, 89, 93-94 (2d Cir. 2012); *Masciandaro*, 638 F.3d at 475 (Wilkinson, J., concurring) ("There may or may not be a Second Amendment right in some places beyond the home, but we have no idea what those places are [or] what the criteria for selecting them should be.").

¶65 While most courts have found that the right applies outside the home, courts have differed in the level of protection that should be afforded to one's right to bear arms outside of the home for self-defense. *Compare Kachalsky*, 701 F.3d at 89 (noting that proper cause require-

ment for carrying a handgun outside the home did not impact the core of the Second Amendment and that the government has greater ability to regulate activities affecting the public), *with Moore*, 702 F.3d at 940 (finding that the right to self-defense is just as important outside the home as it is inside the home).

¶66 In my view, the scope of the Second Amendment has some application outside the home. However, whether the law actually infringes the Second Amendment right will depend on the extent of regulation and the type of activity regulated. *See United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013).

¶67 I would find that Evans' activity was within the scope of the Second Amendment because he was carrying his fixed-blade knife for self-defense, a fact that remained unchallenged by the city of Seattle (City), and seemingly ignored by the majority. However, because the Second Amendment right is not absolute, the inquiry is not complete. *See Heller*, 554 U.S. at 595. Since I believe the law imposes a burden on Evans' Second Amendment right, I would evaluate whether the law interferes with that right by assessing the law under some form of means-end scrutiny. Given the nature of the ordinance, strict scrutiny is appropriate, and the City has not met its burden.

2. *Means-end scrutiny*

¶68 Evans makes three arguments regarding the level of scrutiny that this court should apply to the SMC. He first asserts that, like the law in *Heller*, the SMC destroys his Second Amendment right to self-defense and thus is unconstitutional under any level of scrutiny. In the alternative, he argues that strict scrutiny should apply.[22] Finally, he ar-

---

[22] Amicus Washington Association of Criminal Defense Lawyers (WACDL) also argues that strict scrutiny should be applied to the SMC. Br. of Amicus Curiae WACDL at 11-19. WACDL performs a *State v. Gunwall*, 106 Wn.2d 54, 61-62, 720 P.2d 808 (1986) analysis and finds that article I, section 24 is more protective than the Second Amendment and thus strict scrutiny must apply. Br. of Amicus Curiae

gues that even if this court applies intermediate scrutiny, the law will be unconstitutional.

¶69 The first step is to ascertain the appropriate level of scrutiny. In *Heller*, the Court did not establish a level of scrutiny that should be applied to laws burdening the right to bear arms, holding instead that the law in that case would fail under any level. 554 U.S. at 628-29, 634. The Court did, however, reject rational basis scrutiny as too low of a standard to protect the right to bear arms. *Id*. at 628 n.27. Following *Heller*, federal courts have used different levels of scrutiny depending on the type of law challenged and the extent to which it burdens the Second Amendment right. *See, e.g.*, *Kachalsky*, 701 F.3d at 96-97 (applying intermediate scrutiny); *Drake*, 724 F.3d at 436 (applying a level of scrutiny less than strict scrutiny when the law does not burden the right to protect oneself in the home); *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (applying a level of scrutiny between strict and intermediate to a law creating an elaborate permitting scheme dictating the number and type of firearms allowed in the home).

¶70 Adding a layer of complexity to the scrutiny determination is the Supreme Court's holding in *McDonald v. City of Chicago*, 561 U.S. 742, 778, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) that the right to bear arms is a fundamental right. Strict scrutiny is generally applied to laws burdening fundamental rights. *See Heller v. District of Columbia*, 399 U.S. App. D.C. 314, 670 F.3d 1244, 1256 (2011) (*Heller* II). However, there are exceptions. *Id*. Courts have compared the Second Amendment right to the First Amendment right, where certain regulations are permissible so long as they survive intermediate scrutiny. *Id*. Like the First Amendment, "the level of scrutiny applicable under the Second Amendment surely 'depends on the nature of the conduct being regulated and the degree to which

---

WACDL at 11-19. Neither party presented this court with an analysis of the *Gunwall* factors. Such an analysis is not necessary here because Evans' Second Amendment claim controls the outcome of this case.

the challenged law burdens the right.' " *Id*. at 1257 (quoting *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010)). This reasoning is consistent with *Heller*. 554 U.S. at 595 ("[W]e do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*."). In *Heller* II, the court found that intermediate scrutiny is appropriate where laws " 'do[ ] not severely limit the possession of firearms.' " 670 F.3d at 1257 (alteration in original) (quoting *Marzzarella*, 614 F.3d at 97).

¶71 Although outcomes have varied, courts have agreed as a general matter that " 'the level of scrutiny applied to gun control regulations depends on the regulation's burden on the Second Amendment right.' " *Peruta*, 742 F.3d at 1167 (quoting *Nordyke v. King*, 681 F.3d 1041, 1045-46 (9th Cir. 2012) (O'Scannlain, J., concurring)). To determine the level of scrutiny, courts have used a two-pronged test that requires the court to consider (1) how close the law comes to the core of the Second Amendment right and (2) the severity of the law's burden on the right. *Chovan*, 735 F.3d at 1138.

¶72 To analyze the first prong—that is, to determine how close the law comes to the core of the Second Amendment—courts rely on *Heller*'s holding that the amendment's core is " 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.' " *Id*. (quoting *Heller*, 554 U.S. at 635); *see also Jackson v. City of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2799 (2015).

¶73 To analyze the second prong—that is, to determine the burden placed on the Second Amendment right—the Ninth Circuit explained that laws regulating only the manner in which persons may exercise their Second Amendment right are less burdensome than laws that bar the exercise of the right completely. *See Peruta*, 742 F.3d at 1158; *Chovan*, 735 F.3d at 1146. The court in *Peruta* recognized that historically, there was a distinction between

openly carried and concealed weapons. 742 F.3d at 1164. Statutes prohibiting the carrying of concealed weapons did not conflict with the Second Amendment because they merely regulated the manner in which arms were carried. *Id*. at 1165. While States can regulate the manner in which an arm is carried, the *Peruta* court found that the State cannot completely prohibit a citizen from carrying an arm outside the home. *Id*. at 1165-66.

¶74 Severe restrictions on the core right of the Second Amendment trigger strict scrutiny, while less severe burdens have been reviewed under some lesser form of heightened scrutiny, such as intermediate scrutiny. *See id*. at 1167-68. In cases where the law completely destroys the right protected under the Second Amendment, rather than just burdening it, the courts have found that no level of heightened scrutiny is necessary because the law would fail under all levels. *Id*. (citing *Heller*, 554 U.S. at 628-29). On the other hand, laws that have left open alternative channels for self-defense do not place a substantial burden on the Second Amendment right.[23] *See Marzzarella*, 614 F.3d at 97 (finding that intermediate scrutiny applied to a law that prohibited the possession of firearms without a serial number because it left the ability to own marked firearms untouched); *see also Chovan*, 735 F.3d at 1138 (noting that a law that prohibited domestic violence misdemeanants from owning firearms, but exempted those with expunged, pardoned, or set-aside convictions, had a lessened burden on the right to bear arms than a law that did not have any exemptions limiting applicability).

¶75 This court has undertaken a similar analysis as those taken by the federal courts to determine what level of

---

[23] In addition, the Court in *Heller* noted that the Second Amendment right is not absolute and identified a nonexclusive list of "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626-27; *see also Jorgenson*, 179 Wn.2d at 159. The SMC, however, does not fall into one of these presumptively lawful categories, nor is it analogous to any of the stated examples.

scrutiny should apply to laws burdening the Second Amendment right to bear arms. *See Jorgenson*, 179 Wn.2d at 161 (holding that intermediate scrutiny was appropriate where the law at issue was not as restrictive as the law examined in *Heller*); *see also Sieyes*, 168 Wn.2d at 294 (holding that strict scrutiny of the law was not appropriate where the parties did not show that the law burdened the Second Amendment). In *Jorgenson*, the defendant asserted that former RCW 9.41.040(2)(a)(iv) (2005), which prohibits a person who is "free on bond or personal recognizance pending trial, appeal, or sentencing for a serious offense" from possessing a firearm, violated his Second Amendment right. 179 Wn.2d at 167 n.1 (Wiggins, J., dissenting). This court noted in *Jorgenson* that courts have applied differing levels of scrutiny depending on the limit imposed on the Second Amendment right and the type of law at issue. *Id*. at 159-60. The court then compared the challenged statute to the District of Columbia law in *Heller* and found that the Washington statute, unlike the law in *Heller*, did not apply to all citizens and was limited in duration. *Id*. Therefore, since the statute placed less of an imposition on the right to bear arms, this court determined that intermediate scrutiny should apply. *Id*. at 162.

¶76 Evans contends that, like the laws in *Peruta* and *Heller*, the SMC fails under any level of scrutiny because it infringes the core right of the Second Amendment by severely burdening his right to carry an arm for self-defense. According to Evans, the SMC bans citizens from carrying an entire class of arms that is a popular choice for self-defense.

a) Applying the first prong: core of the Second Amendment

¶77 First, I would examine whether the SMC implicates the core of the Second Amendment. The court in *Peruta* recognized that the core of the Second Amendment protections extend outside the home. 742 F.3d at 1167. However,

the court also noted that Second Amendment protections are most acute within the home. *Id*. at 1153. Most courts have stated that a law implicates the core of the Second Amendment when it restricts a law-abiding citizen from possessing arms within the home for self-defense. *See, e.g.*, *Jackson*, 746 F.3d at 963 (noting that the law implicates the core of the Second Amendment because it prevents law-abiding citizens from possessing handguns in the home); *Chovan*, 735 F.3d at 1138 (holding that a law did not implicate the core of the Second Amendment because it prevented only those convicted of a domestic violence misdemeanor from possessing an arm).

¶78 SMC 12A.14.100(C) exempts the proscription of carrying a fixed-blade knife while one is in his or her place of abode or place of business. Because the SMC does not prevent Evans from having a knife in his home for the purpose of self-defense, this law does not implicate, as strongly, the core protections of the Second Amendment as the law did in *Heller*. However, because the law prohibits all citizens from carrying a knife for self-protection or self-defense, the law is similar to the county's law examined in *Peruta* and, at least partially, implicates the core protections of the Second Amendment.

b) Applying the second prong: burden on the Second Amendment right

¶79 Second, I would determine the extent of the burden the SMC places on one's Second Amendment right.[24] Because the Second Amendment is a fundamental right, some form of heightened scrutiny is appropriate. Moreover, the SMC places a substantial burden on a law-abiding citizen's right to bear arms outside the home for self-defense, making strict scrutiny the proper analysis.

---

[24] The extent of the burden depends on whether the class of arms here is fixed-blade knives or knives generally. *Heller* considered handguns as an entire class of arms. Like *Heller*, I examine the SMC by considering fixed-blade knives as a class of arms.

¶80 The *Peruta* court found that the county's law severely burdened a citizen's Second Amendment right, such that it was presumptively unconstitutional. 724 F.3d at 1169. The court noted that it was not enough that the San Diego County law allowed some people to bear arms in some places at some times. *Id*. Because the Second Amendment confers an individual right, the court asserted that the appropriate question is whether the law allows a typical law-abiding citizen to bear arms in public for self-defense. *Id*. Similarly, the Court in *Heller* found that the severity of the District of Columbia ordinance failed under any level of scrutiny because it "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [self-defense]." 554 U.S. at 628.

¶81 Like the law in *Heller*, the SMC prohibits the carrying of an entire class of arms used for self-defense and does more than merely regulate the manner in which one may carry an arm for self-defense. There is no permit option available to carry either a concealed or an unconcealed fixed-blade knife. Evans contends that a fixed-blade knife has many qualities that make it superior for self-defense and presented evidence that a knife is a very popular weapon for self-defense. Analogous to the law in *Peruta*, the SMC prohibits typical law-abiding citizens from carrying an arm of their choice in public for self-defense. Indeed, the SMC may place a more severe burden on the Second Amendment than did the law in *Peruta*. The law evaluated by the *Peruta* court theoretically allowed some people to receive a permit under the county's law. In contrast, the SMC prohibits everyone, with limited exceptions, from carrying a fixed-blade knife for self-defense. Moreover, the SMC regulation extends to carrying the knife concealed or unconcealed, amounting to a complete prohibition.

¶82 The SMC implicates the core of the Second Amendment by prohibiting law-abiding citizens from possessing protected arms for self-defense and thereby severely burdens the right to bear arms. Thus, like the laws in *Peruta* and *Heller*, the SMC is presumptively unconstitutional.

¶83 Although some courts have noted that where the law leaves open alternative channels for self-defense, the burden placed on the Second Amendment is lessened, the *Peruta* and *Heller* courts did not accept this argument.[25] The *Heller* Court reasoned that because the handgun is the most popular weapon for self-defense, a complete ban is invalid. *Id*.

¶84 Evans has presented evidence that knives are popular and appealing for self-defense. Thus, given *Heller*'s reasoning, my conclusion—that the SMC is presumptively unconstitutional—is not altered by the fact that Washington's firearm laws[26] and the SMC[27] may permit possession of other arms.

¶85 However, even if we accept, as some courts have, that alternative channels for self-defense lessen the burden on the Second Amendment, the SMC must still be subjected to the application of a means-end scrutiny test, which it cannot survive. As noted above, strict scrutiny is presumed when a law burdens a fundamental right. The SMC also places a substantial burden on the right to bear arms and does more than simply regulate the manner in which an arm may be carried. Therefore, the law must be subjected to some form of heightened scrutiny. *See Chovan*, 735 F.3d at 1138-39. Because the SMC places a substantial burden on the right to self-defense, it must have a strong justification, and, therefore, strict scrutiny is appropriate. *Heller* II, 670 F.3d at 1257 ("[A] regulation that imposes a substantial

---

[25] *Compare DeCiccio*, 315 Conn. at 141-42 (applying intermediate scrutiny because the law's exceptions allowed some to own a "myriad of other weapons that fall within the purview of the [S]econd [A]mendment"), *with Heller*, 554 U.S. at 629 ("It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms . . . is allowed.").

[26] Washington firearm laws preempt the SMC. *See, e.g.*, RCW 9.41.050 (permitting Washington residents to carry a concealed pistol on their person so long as they have a license), .270(1) (allowing firearms to be openly carried provided such carriage does not "warrant[ ] alarm for the safety of other persons").

[27] *See* former SMC 12A.14.010(C) (allowing the possession of a knife with a blade less than three and one-half inches so long as the blade folds into the handle).

burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify.").

### c) Application of strict scrutiny

¶86 To survive strict scrutiny, a law must be narrowly tailored to a compelling governmental purpose. *Sieyes*, 168 Wn.2d at 294. In *Montana*, this court found that "[former] SMC 12A.14.080 furthers a substantial public interest in safety, addressing the threat posed by knife-wielding individuals and those disposed to brawls and quarrels, through reducing the number and availability of fixed-blade knives in public places in Seattle." 129 Wn.2d at 592. The City has a compelling interest in protecting the community from crime. *See Schall v. Martin*, 467 U.S. 253, 264, 104 S. Ct. 2403, 81 L. Ed. 2d 207 (1984). The issue, then, is whether the SMC is narrowly tailored to the City's compelling interest. In my view, it is not.

¶87 For a law to be narrowly tailored, it must be the least restrictive means available to achieve the governmental interest. *See Kachalsky*, 701 F.3d at 97. Because the SMC bans the carrying of all fixed-blade knives by any person in the City, it is too broad to withstand strict scrutiny. The SMC has minimal exceptions, none of which allow carrying a fixed-blade knife for the constitutionally protected right of self-defense. The SMC equates carrying a fixed-blade knife for self-defense with unlawful activity, an outcome that is impermissible provided that the knife is a protected arm. The City's regulatory scheme also fails to provide a permit option to carry fixed-blade knives. Moreover, the SMC is underinclusive. The SMC allows for the carrying of firearms, which are potentially more of a threat to public safety than knives. *See United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) (noting that firearms are about five times more deadly than knives). The SMC's distinction between fixed-blade and folding knives also lacks logical

consistency. *See* Kopel, Cramer & Olson, *supra*, at 173 (dispelling the "misguided assumption that a fixed-blade knife is a weapon whereas a folding knife is just a tool"). Therefore, the SMC is not narrowly tailored to achieve the City's compelling purpose.

¶88  I would hold that the SMC, as applied to Evans—a law-abiding citizen possessing a fixed-blade knife for self-defense—is presumptively unconstitutional under the Second Amendment. I would hold that a fixed-blade knife is an arm under the Second Amendment and that the Second Amendment's protections extend beyond the home. Alternatively, I would hold that in similar factual scenarios to Evans', the SMC fails under strict scrutiny because it places too severe of a burden on one's Second Amendment right to bear arms. Evans' appeal is controlled by his federal challenge. Given that the Second Amendment provides greater protection, this court must reevaluate its holding in *Montana*, and that decision should be abrogated.

¶89  I also note that this decision would not prohibit or deter the regulation of knives or other arms. As the *Heller* Court explained, the Second Amendment right is not absolute. Here, however, the SMC's restriction on fixed-blade knives is too broad and too harsh. Additionally, strict scrutiny should not be applied to every law that implicates the Second Amendment. A court analyzing such laws must go through the analytical approach described above to determine what level of scrutiny is appropriate.

¶90  I respectfully dissent.

JOHNSON, OWENS, and GORDON MCCLOUD, JJ., concur with FAIRHURST, J.

Reconsideration denied March 3, 2016.